## THE STATE OF INDIANA v. WILLETT.

[No. 21,247. Filed November 24, 1908.]

1. INSURANCE.—*Kinds.*—There are three kinds of insurance—stock, where stockholders contribute the capital, pay the losses, and receive the dividends—mutual, where the members constitute the insurers and insured, contributing by assessments to pay losses, and dividing profits according to interest—and mixed, embodying features of both stock and mutual. p. 301.

2. SAME.—*Objects.*—The object of insurance is to indemnify against loss, occasioned by the happening of some event. p. 301.

3. SAME.—*Life.*—In life insurance the event insured against is the death of some individual; and such event is sure to happen. p. 301.

4. SAME.—*Indemnity for Burial Purposes.*—Insurance for providing the insured a proper burial is not prohibited by law. p. 301.

5. SAME.—*Definition.*—*Words and Phrases.*—An insurance contract is one whereby the insurer for an agreed premium undertakes to compensate the assured for loss on account of specified perils. p. 302.

6. SAME.—*Life.*—*Burial.*—Insurance whereby an association promises to furnish for each deceased member a burial to cost the sum of $75, being contingent upon the death of the member, is life insurance within the meaning of §4713 Burns 1908, Acts 1901, p. 374, prohibiting the writing of life insurance under certain restrictions. p. 303.

7. SAME.—*Life.*—*Restrictions On.*—*Evasion of Statute.*—Section 4713 Burns 1908, Acts 1901, p. 374, making it unlawful for an insurer to receive an application for insurance where the bene-

ficiary has no insurable interest in assured's life, or unless the beneficiary is not farther removed than first cousin to assured, or unless assured shall not have passed a satisfactory medical examination, must be liberally construed to prevent any evasion thereof. p. 304.

8. WORDS AND PHRASES.—*"Beneficiary."—Insurance.*—A "beneficiary" is one who receives a benefit; and in insurance, imports the one to whom the policy is payable. p. 304.

9. INSURANCE.—*Burial.—Beneficiary.*—In a burial insurance policy providing that assured is "entitled to all the benefits of a member of the association in accordance with the by-laws," and the by-laws providing that the association, at a member's death, should pay $75 to a certain undertaker for burial goods and services, and should pay nothing "to the surviving relatives and friends as death benefits," such undertaker is the real beneficiary. p. 305.

10. INDICTMENT AND INFORMATION.—*Unlawfully Writing Insurance.—Beneficiaries.*—An affidavit charging that neither the accused firm of undertakers nor any member thereof had any *bona fide*, insurable interest in the life of the assured whose beneficiary they were, nor were they related in any degree to him, sufficiently shows that the insurance was unlawfully written (§4713 Burns 1908, Acts 1901, p. 374). p. 306.

11. SAME.—*Insurance.—Beneficiaries.*—An affidavit charging that defendant unlawfully wrote a policy of insurance upon a certain person who had not passed a satisfactory medical examination, sufficiently shows a violation of §4713 Burns 1908, Acts 1901, p. 374. p. 307.

From Hancock Circuit Court; *Robert L. Mason*, Judge.

Prosecution by The State of Indiana against Matt Willett. From a judgment for defendant, the State appeals. *Reversed.*

*James Bingham*, Attorney-General, *H. M. Dowling, A. G. Cavins, William H. Thompson* and *E. M. White,* for the State.

*Cook & Cook, William A. Hough* and *Felt & Binford,* for appellee.

HADLEY, J.—The prosecuting attorney filed an affidavit charging appellee with writing a policy of insurance in violation of §4713 Burns 1908, Acts 1901, p. 374. Appellee's motion to quash the affidavit was sustained, and the State appeals.

The first count of the affidavit stated, in substance, that the appellee, on December 10, 1907, knowingly and unlawfully wrote a policy of insurance upon the life of Charles C. Davis, who was then and there an individual in the State of Indiana. The policy read as follows:

"No. 8,539.      Greenfield, Indiana, December 10, 1907.

This is to certify that Charles C. Davis, who was born on the 1st day of July, 1867, is entitled to membership in the Greenfield Mutual Burial Association, and entitled to all the benefits as a member of said association, in accordance with the by-laws thereof.

M. T. Smith, president.

Attest: Oak S. Morrison, secretary."

The affidavit then sets out the by-laws of the Greenfield Mutual Burial Association, which state that the object of the association is to provide a plan for the payment of funeral expenses for the members thereof, which plan consists of the payment, by assessment, of funeral expenses to the amount of $75 for each member ten years of age or over, and $37.50 for each member under ten years of age. Any person in good health, between the age of one year and seventy years, may become a member by paying an initiation fee of ten cents if over ten years of age, and five cents if under ten years of age. The officers shall consist of president, vice-president, secretary and treasurer, the duties of the last two offices to be performed by the same person, and these three persons shall constitute a "board of control," and have full power to direct the affairs of the association. These officers are to be elected annually, if necessary, and each of the various adult members is given one vote.

When a member over ten years of age dies, every member over ten years old shall pay eleven cents, ten cents to be used as "funeral expenses," and one cent to be used for "paying for collections;" all members under ten years of age and over five years of age shall pay five cents, all of which is to go for funeral expenses. When a member under ten years of age dies, each member over ten years of age

shall pay six cents, five cents of which shall be used to pay funeral expenses, and one cent for collections; members under ten years of age shall pay three cents each, all of which is to be used for funeral expenses. Failure to pay any such assessment for thirty days forfeits the membership and all previous payments. In case the membership becomes so reduced that the benefits promised in the by-laws cannot be paid, only such benefits are to be furnished as the assessments justify. If there should be an excess of revenue from the assessments, such excess shall be paid into the treasury, to be applied on future benefits, as the necessity therefor may arise.

A member removing to such a distance as to render the services of the association's undertaker impracticable must notify the association's undertaker of such removal, and give the name of an undertaker preferred at the new place of residence. Failure to do so forfeits all rights in the association. No salary shall be paid to any officer.

The initiation fees shall be paid into an expense fund, for the "expenses of organizing the association, and such subsequent expenses as may be incurred legitimately." The president can call meetings of the association at his pleasure, and must do so upon a written request of ten members. Applicants for membership are required to be in good health. Each member shall receive a certificate as follows:

"No. . . . . . .        Greenfield, Indiana, . . . . . . . . . ., 190. .
This is to certify that . . . . . . . . . . . . . . . . . ., who was born on the . . . . . . . . day of . . . . . . . . . . . ., . . . . . . . ., is entitled to membership in the Greenfield Mutual Burial Association, and entitled to all the benefits of a member of said association, in accordance with the by-laws thereof.
                    . . . . . . . . . . . . . . . . . . . . . ., president.
. . . . . . . . . . . . . . . . . . . . . . . . ., secretary."

Articles fourteen and fifteen are in these words:

"The benefits herein provided are for the purpose of furnishing respectable funeral and burial services for

deceased members, and the benefits provided are to be paid to the undertaker furnishing such services, and not to surviving relatives and friends as death benefits. It is agreed that the goods for said funerals shall be furnished and services rendered by C. W. Morrison & Son, their heirs and assigns, and they are hereby designated the official undertakers of this association.

Board of control { Marshall T. Smith, president, Joel B. Pusey, vice-president, Oak S. Morrison, secretary and treasurer."

The affidavit further charged that neither the beneficiary named in said policy of insurance, nor any member of the firm of C. W. Morrison & Son, had any *bona fide* insurable interest, in whole or in part, in the life of said Charles C. Davis at the time said policy was issued, nor at said time was the beneficiary of such policy, nor was any member of the firm of C. W. Morrison & Son related to said Charles C. Davis in any degree of kinship whatever.

Section 4713, *supra,* forbids the taking or the receiving of any application for any insurance upon the life of any person in the State of Indiana, in favor of any person who has not a *bona fide* insurable interest in the life of the insured, or who is not related to him within a degree not further removed than first cousins. It also forbids the issuance of a policy of insurance where the insured has not been subjected to, and satisfactorily passed, a medical examination by a duly authorized physician.

The offenses created by this statute relate to the character of the interest or relationship of beneficiaries in contracts of insurance, and the state of the health of the insured. The first question to be determined is whether the Greenfield Mutual Burial Association, as shown by its by-laws and certificates of membership, is engaged in doing a life insurance business; or, in other words, whether one of their certificates, such as was issued in this case, is, in legal contemplation, an insurance contract upon the life of the person named.

There are three kinds of insurance companies—stock, mutual and mixed. A "stock company" is one where the stockholders contribute all the capital, pay all the losses, and take all the profits. A "mutual company" is one wherein the members constitute both the insurer and the insured, where the members all contribute, by a system of assessments, to the creation of a fund from which all losses and liabilities are paid, and wherein the profits are divided among themselves in proportion to their interests. A "mixed company" is such as the term implies. It embodies the characteristics of both the others.

The subjects of insurance are numberless. The various systems, with their ramifications, offer indemnity for almost every conceivable loss or injury that may be sustained, and which depends upon future possibility or uncertainty in point of time. It embraces the hazards of navigation, losses by fire, lightning, tornadoes, accidents of almost every character, insolvency of debtors, dishonesty and negligence of employes, failure of title to real estate, death of human beings and of animals. In life, insurance, the event insured against is sure to happen, and at some time the indemnity promised the beneficiary is sure to be demandable to the full amount stipulated in the contract.

But the contracts made by all kinds of insurance companies are plain indemnity contracts; contracts by which one party agrees, for a stipulated sum, to assume some risk borne by the other party, and, if the apprehended loss occurs, to make the loser whole by reimbursing him fully, or to the extent agreed upon in the contract.

There is no doubt that a contract founded upon a legal consideration, whereby the obligor undertakes to furnish the obligee, or one of the latter's near relatives, as the case may be, at death, a burial reasonably worth a fixed sum, would be a valid contract. If the citizen of small means, or for any other reason, desires to make a

definite arrangement for the expenses of his funeral, and thus make certain of a sufficient amount to secure a respectable burial, the law will sustain him, if he will keep his contract within certain, well-defined limitations demanded by both the statute and public policy. Such a contract, however phrased, would be an indemnity contract.

Bouvier defines an insurance contract to be one "whereby, for an agreed premium, one party undertakes to .compensate the other for loss on a specified subject by specified perils." 1 Bouvier's Law Dict. (Rawle's ed.), p. 1068, title, Insurance.

5. In *State, ex rel., v. Pittsburgh, etc., R. Co.* (1903), 68 Ohio St. 9, 67 N. E. 93, 64 L. R. A. 405, 96 Am. St. 635, life and accident insurance are defined as contracts "whereby one party, for a stipulated consideration, agrees to indemnify another against injuries by accident or death."

In *Commonwealth v. Equitable Ben. Assn.* (1890), 137 Pa. St. 412, 18 Atl. 1112, it is said in the syllabus: "A contract of insurance is purely a business adventure, not founded on any philanthropic, benevolent or charitable principle; and the design and purpose of an insurance company, and the dominant and characteristic feature of its contract, are the granting of an indemnity, or security against loss, for a stipulated consideration."

The same subject is stated in 1 Cooley, Briefs on Ins., p. 5, thus: "Perhaps a better definition is that a contract of insurance is an agreement by which one party for a consideration promises to pay money or its equivalent or do some act of value to the assured upon the destruction or injury of something in which the other party has an interest." In 25 Cyc., 698, it is said: "To render a contract one of life insurance the payments must be contingent upon the duration of human life." See, also, 1 May, Insurance, §112; Standard Dict., title, Insurance; *People, ex rel., v. Rose* (1898), 174 Ill. 310, 51 N. E. 246, 44 L. R. A. 124; 4 Words

and Phrases, 3674, title, Insurance; 16 Am. and Eng. Ency. Law (2d ed.), 878.

In the light of the foregoing definitions, we again inquire: Was the contract solicited and taken of Charles C. Davis, by appellee, any kind of life insurance, within the meaning of the statute? The contract was issued by an association whose declared object was to secure, or make certain, by a system of mutual contribution, to each member of the association, at death, the specific benefit of $75 for application to his burial service. This was indemnity, or security, that, at the cessation of the life'of the member, a certain sum of money would be payable by the association for his burial, whether the deceased had paid one assessment or a thousand. The controlling elements of the contract, as interpreted by the by-laws, are in all material respects similar to those of an ordinary mutual life insurance company. The members of the association are both the indemnitors and the indemnitees. The association pays its losses from a mutually contributed fund, and divides its profits among the members. Death assessments must be paid by the contract holder during the life of the insured, and the promised indemnity is payable in a lump sum, and in a definite amount. The association needs and employs agents to represent it. It solicits from the general public. It is founded on no principle of philanthropy, benevolence or charity. It is not a benefit and protective society, designed to furnish relief to its sick and disabled members out of funds mutually contributed for that purpose. It is simply a business enterprise, in which the contract holder is promised a definite thing, in consideration of his performance of a definite undertaking on his part. The contract is determinable by the cessation of a human life, and belongs to that extended class of agreements dependent upon such contingency, and commonly known as life insurance. It is, therefore, life insurance within the meaning of §4713 Burns

1908, Acts 1901, p. 374, and subject to the wholesome provisions of our insurance laws. *State, ex rel.,* v. *Wichita Mut. Burial Assn.* (1906), 73 Kan. 179, 84 Pac. 757; *Fikes* v. *State* (1905), 87 Miss. 251, 39 South. 783; *State* v. *Beardsley* (1902), 88 Minn. 20, 92 N. W. 472; *In re Solebury Mut., etc., Society* (1885), 4 Com. Pl. (Pa.) 11.

The case of *State, ex rel.,* v. *Wichita Mut. Burial Assn., supra,* involved an association that had by-laws and issued certificates of membership substantially identical with those under consideration; and, concerning the purposes of the association, the court said: "The business designed to be transacted under the plan of the Wichita Mutual Burial Association is plain, ordinary insurance."

In the case before us, some of the details of the plan, as outlined by the by-laws, are veiled, and give evidence of an effort to avoid the classification just made. Some of

7.   the provisions are unreasonable, some unguarded, and others indefinite, and all tend to expose the concern to the suspicion that the whole system is, in real design, but the scheme of an undertaker to promote his private business, largely at the expense of persons of small means. A wise public policy demands that the laws be liberally construed to circumvent any attempt, by such bodies, to evade the reasonable and beneficent restraints of the statute.

This leads us to the important inquiry: Does it appear that the beneficiary of the contract has an insurable interest in the life of the insured, Charles C. Davis? First, who is the beneficiary of the insurance contract? It is contended by the Attorney-General that it is C. W. Morrison & Son, the official undertakers, and by the appellee, that it is Davis's estate and next of kin, who, but for the insurance, would be called upon to furnish the funds for the burial.

"Beneficiary" is defined in Webster's Int. Dict. as "one who receives a benefit or advantage." "The 'benefi-

8.   ciary' is the person to whom a policy of insurance effected is payable." 1 Words and Phrases, 750.

There is no beneficiary named in the certificate of membership issued to Charles C. Davis, and nothing of the contract is mentioned, beyond the statement that Charles C. Davis is a member "and entitled to all the benefits of a member of the association in accordance with the by-laws thereof." So we must go to the by-laws for an exposition of the contract.

. From these by-laws we learn the terms of the contract to be that Charles C. Davis, as a member, had undertaken to pay to the association eleven cents on every death in the membership that should occur before his own, in consideration of which, upon his death, the association was to pay to C. W. Morrison & Son $75 for burial goods and service. It is expressly agreed, as shown by articles fourteen and fifteen, before set out, that C. W. Morrison & Son, their heirs and assigns, as undertakers, were to furnish the supplies and services for the burial, and the association was to pay to them, for such services, the full amount of the benefits accruing under the policy contract, and no part thereof was to be paid "to the surviving relatives and friends as death benefits."

It is plain that the contracting parties intended to make Morrison & Son the sole beneficiaries. Under the by-laws, the insured is not entitled to withdraw profits, or to receive dividends, or sick or other benefits. He is not even entitled to revoke the appointment of his undertaker, and commit that duty to his relatives and friends. The $75 benefit must be paid to Morrison & Son, their heirs and assigns, and to no one else. Neither the administrator nor the heirs of the insured could maintain an action against the association for a default in payment. The right to bury the insured is a contract right of Morrison & Son, deemed so absolute, personal and beneficial as to be descendible and assignable. If it should turn out that the insured, at the end of life, has

neither estate nor next of kin, would that contingency make Morrison & Son any more beneficiaries than they otherwise are?

It is argued that the undertakers will take no benefit; that they will return the money's worth to the deceased. In answer, it may be said that they may at least take the contractor's profit, which, under the by-laws, is left to their unbridled greed.

We conclude that if the estate, or next of kin, can, under the terms of the contract, be considered, in any just sense, beneficiaries, it must be ascribed to a secondary degree, and we hold that Morrison & Son, as the official undertakers of said association, are the primary and intended beneficiaries.

The question then arises: Have Morrison & Son a *bona fide,* insurable interest, in whole, or in part, in the life of the insured? It is said in 4 Words and Phrases, 10. 3672: "The tendency of the American decisions is to · hold that, wherever there is any well-founded expectation of or claim to any advantage to be derived from the continuance of a life, there is an insurable interest in the life. * * * Bliss, Life Ins., §§21-31; 1 May, Insurance, §§102-111. A person has an insurable interest in the life of another when there is a reasonable probability that he will gain by the latter's remaining alive, or lose by his death. 3 Kent's Comm. (14th ed.), 566, note."

It is charged in the affidavit that neither the firm, nor any member of the firm of Morrison & Son, had any *bona fide,* insurable interest in the life of Charles C. Davis at the time said policy was issued, nor was the firm, nor any member thereof, at the time, related to said Charles C. Davis in any degree of kinship. There is nothing in the case, as against these direct averments, from which we can infer either an insurable interest or kinship.

The second count alleged substantially the same facts as did the first, set out a copy of the by-laws. and then charged

that at the time said policy was written and issued said Charles C. Davis, the person whose life was thereby insured and to whom the policy was issued, had not first passed a satisfactory medical examination by a physician duly authorized to practice medicine in the State of Indiana. This count also stated a sufficient charge under said section.

The judgment is reversed, and the cause remanded, with instructions to overrule the motion to quash the affidavit.